**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CHARLES CARD,**

      **Plaintiff,**

   **v.**                                 **ACTION NO. 2:00cv631**

**D.C. DEPARTMENT OF CORRECTIONS, et al.,**

        **Defendants.**


<u>**OPINION AND ORDER**</u>

      Plaintiff brings this action pursuant to 42 U.S.C. § 1983, to redress alleged violations of his constitutional rights.  Specifically, plaintiff claims he was subjected to cruel and unusual punishment and denial of due process by being subjected to five-point restraints for forty-six to forty-eight hours at a time on five different occasions.[1]  Plaintiff demands one million dollars in compensatory damages and one million dollars in punitive damages.  This action is before the court on plaintiff's motions for partial summary judgment.  On March 3, 2005, the parties argued the motions for partial summary judgment before this court.  The court has continued this action since that time based on defendants' motion for a stay under the Servicemembers' Civil Relief Act, 50 U.S.C. App. § 501.  That motion has been withdrawn. For the reasons discussed below, plaintiff's motion for partial summary

---

      [1] This court's previous opinions and orders refer to the restraints as four-point rather than five-point.  At a hearing held on March 3, 2005, the parties clarified that five-point restraints were used.

judgment on the issue of liability is **GRANTED** and the motion for summary

judgment on punitive damages is **DENIED**.

<u>I. Procedural History</u>

This action was originally filed in the United States District Court for the

District of Columbia.  On August 25, 2000, this action was transferred to this

court.   By order filed November 21, 2000, this action was dismissed after plaintiff

failed to sign a consent to withdrawal of fees form.  Plaintiff filed an appeal to the

Court of Appeals for the Fourth Circuit.  Plaintiff's appeal was dismissed pursuant

to <u>Domino Sugar Corp. v. Sugar Workers Local Union 392</u>, 10 F. 3d 1064, 1066-

67 (4th Cir. 1993), because plaintiff could save his complaint by providing the

information this court had requested.  <u>Card v. D.C. Dep't of Corr.</u>, No. 00-7768

(4th Cir. March 16, 2001)(unpublished <u>per</u> <u>curiam</u> opinion).  Subsequently, plaintiff

submitted a signed consent form to this court.  By order entered July 9, 2001, the

court reopened this action.

By order filed July 2, 2002, the court granted plaintiff's motion to amend to

name defendant York.  In addition, the court dismissed the Commonwealth of

Virginia's Department of Corrections as a defendant in this action.  On August 28,

2002, defendants filed a motion to dismiss based on the expiration of the Virginia

statute of limitations for confined persons seeking to challenge their conditions of

confinement, Va. Code Ann. § 8.01-243.2 (1950), as amended.  By opinion

entered October 28, 2002, the court denied defendants' motion to dismiss.

Defendants filed a motion for leave to take an interlocutory appeal and to stay this action.  By order filed November 18, 2002, the court denied defendants' motion for an interlocutory appeal.

On November 29, 2002, defendants filed a motion for summary judgment with affidavits in support thereof.  In accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), plaintiff was given an opportunity to respond to defendants' motion with any material that he wished to offer in rebuttal.  On December 20, 2002, plaintiff filed his response along with his affidavit in support. The court determined that several of the defendants had failed to file an answer. Thus, by order filed May 6, 2003, defendants were ordered to file an answer.  On May 12, 2003, defendants filed their answer.  Plaintiff filed a supplemental response on May 19, 2003.

By opinion and order entered September 30, 2003, the court granted in part and denied in part defendants' motion for summary judgment.  The court granted defendants' motion for summary judgment on claims that 1) defendants Hawes and Scott used excessive force when they used a stun gun on plaintiff after plaintiff spit on them; 2) plaintiff was subjected to cruel and unusual punishment, denial of due process, intentional infliction of emotional harm, harassment, discrimination, and torture when his mattress and personal belongings were confiscated; and 3) plaintiff was denied use of the telephone and wrongfully convicted of a bogus disciplinary charge and placed in segregation.   The court denied summary judgment

3

on plaintiff's claims that he was subjected to cruel and unusual punishment and denial of due process by being subjected to five-point restraints on various occasions.  The court also denied defendants' claim of qualified immunity on these claims.  However, the court granted defendants leave to supplement their motion for summary judgment.  On November 28, 2003, defendants filed a supplemental motion for summary judgment, along with the affidavit of Eddie Pearson, Chief Warden.  Plaintiff responded on December 8, 2003.

By opinion and order entered July 9, 2004, the court denied defendants' supplemental motion for summary judgment, and determined that defendants were not entitled to qualified immunity.  Defendants D.C. Department of Corrections, Odie Washington, Hulon Willis, Ronald Angelone,  Rufus Flemming, Marvin Trisvan, M.D. Brown, W.  Skinner, Ellesworth C.  Murray, J.K. Vaughan, Sr., Anthony Williams, Margaret Moore, Calvin Edwards, Adrienne Poteat, and Elwood York were dismissed as defendants in this action.  Accordingly, the remaining defendants are Eddie L.  Pearson, David B.  Everett, Jamilla F.  Burney, Houston Shiflett, Ivan Gilmore, Kenneth S.  Turner, Sgt.  Bullock, Larry Wyche, R.J. Arft, Correctional Officer Hawes, and C. Scott.  The court further determined that appointment of counsel was appropriate.  The court appointed R. Johan Conrod, Jr. to represent plaintiff.

On October 20, 2004, counsel for plaintiff, with leave of court, filed a second amended complaint, naming only those defendants involved in the

4

remaining claims, streamlining plaintiff's complaint, and seeking $1,000,000.00 in compensatory damages and $1,000,000.00 in punitive damages.  On December 17, 2004, plaintiff filed a motion for partial summary judgment on the issue of liability for Count I and II of the second amended complaint---excessive force and due process respectively. On December 20, 2004, plaintiff filed a motion for partial summary judgment on Count III---liability for punitive damages.  Plaintiff has also asked for an award of attorney's fees.  The court heard oral arguments on March 3, 2005.

All parties have had an adequate opportunity to present their case to this court, and therefore, this matter is ripe for judicial determination.

## II. Facts

Plaintiff was a District of Columbia prisoner, confined at Sussex II State Prison (SIISP) from April 6, 1999, when he was received from the District of Columbia, until February 23, 2000, when he was transferred to federal custody. All events complained of occurred during plaintiff's incarceration at SIISP.

The facts with respect to plaintiff being placed in five-point restraints are not materially disputed.  On April 11, 1999, plaintiff received a major offense charge when he was seen standing in front of his cell door window stroking his penis.  On May 15, 1999, plaintiff received a major offense charge for threatening bodily harm to any person.[2]  On May 17, 1999, plaintiff was placed in five-point restraints for

---

[2]On June 1, 1999, plaintiff was found guilty of this charge and penalized 15 days in isolation.  Plaintiff "told Officer Parlante that he would 'kill my mother-

kicking his cell door.[3]   At approximately 8:49 a.m., Assistant Warden Burney

("Burney"), Sergeant Bullock ("Bullock"), and Warden Pearson ("Pearson") were

conducting the morning inspection.  According to the serious incident report,

plaintiff was continuously kicking his cell door and being disruptive.  Bullock spoke

with plaintiff and was told by plaintiff that he had been trying to get toothpaste, a

toothbrush and deodorant for weeks.  At approximately, 10:05 a.m., plaintiff was

placed in the five-point restraints and his cell was searched.  The items that plaintiff

claims he had been trying to obtain were found in his cell.  Plaintiff claims that he

only had those items because he had borrowed them from other inmates.

        Officers Dorsey, Byrd, Davis and Meents were responsible for placing

plaintiff in restraints per an order by Burney.  Plaintiff's restraints were checked by

Nurse Richards to ensure that his circulation was normal.  Plaintiff was restrained

for forty-eight hours with eight breaks for meals and use of the restroom.  A nurse

---

fucking honkey ass'."  Pearson Aff.  ¶  10.

        [3]When placed in five-point restraints, an inmate is positioned face up on a
bed, and leather straps are applied to the wrists, ankles and across the chest.
Division Operating Procedure (DOP) 432, effective July 1, 1995 through October
16, 2000, governed the use of five-point restraints at the time of the events
currently under review.  According to DOP 432, the purpose of in-cell restraint is to
prevent escape and control violent or unmanageable inmates in situations where
there is substantial danger for those inmates to injure themselves or other persons
or when an immediate threat to security exists.   Restraints within a cell may only
be approved by the Warden or Administrative Duty Officer.  An inmate should be
released from restraints if the inmate's dangerous or disruptive behavior has
subsided, and it has been determined the inmate no longer poses a threat to himself
or others.  The maximum period of such restraint is forty-eight hours, unless
express approval for extended restraint is obtained from the Deputy Director of the
Virginia Department of Corrections.

checked the restraints each time they were reapplied.  On May 18, 1999, the nurse noted in plaintiff's chart that he complained of aches and pains all over.

On May 27, 1999, at approximately 12:30 p.m., plaintiff was again beating on his door.  Major Gilmore was making rounds at the time and notified Burney. Burney authorized placement of plaintiff in five-point restraints.  Officers Byrd, Davis, Richards, and Alee, under the supervision of Sergeant Wyche, placed plaintiff in five-point restraints at 1:45 p.m. The restraints were checked by Nurse Richards to ensure normal circulation.  Plaintiff was restrained for forty-eight hours with eight breaks from restraint for meals and use of the restroom.  A nurse checked the restraints each time they were reapplied.

The events of June 17, 1999, are not materially in dispute.  On June 17, 1999, at approximately 2:50 p.m., Officers Hawes ("Hawes") and Scott ("Scott") were escorting plaintiff to his cell after a disciplinary hearing.  According to defendants, while Scott was removing the leg irons from plaintiff, plaintiff pulled away from Hawes and spit in his face.  Plaintiff does not expressly deny this; plaintiff merely states he spit in Hawes' face after Hawes shoved plaintiff into the metal door jam of plaintiff's cell door.  Defendants claim that plaintiff then attempted to rush out of his cell.  Plaintiff does not deny trying to pull away from the officers, however, he asserts that he was not attempting to escape from his cell.  Plaintiff claims that he was trying to run to the back of his cell.  Scott

7

administered two eight second bursts from an Ultron II devise.[4]

A nurse checked on plaintiff at 4:20 p.m. and observed plaintiff sitting on the side of his bed. The nurse evaluated a small cut that plaintiff had sustained. Plaintiff was placed in five-point restraints at 5:09 p.m., on June 17, 1999, by Sergeant Arft ("Arft") and Officers Barnes, Diaz and Messenger. The restraints were checked by a nurse at 6:10. The nurse found that the right wrist restraint was too tight, and notified Lt. Wilson. The restraint was loosened at 6:20. Plaintiff was restrained for forty-eight hours, with nine breaks for meals and to use the restroom. Plaintiff claims that during this period, he urinated and defecated on himself, and was not let up for half an hour afterward. Plaintiff claims that he was not allowed a shower, but merely given clean clothes and his mattress was turned. Plaintiff's restraints were checked each time they were reapplied, with one exception when a nurse did not come to perform the check despite being called.

Plaintiff received a Major Offense #105 charge, assault upon any person, as a result of the June 17, 1999-incident. Plaintiff was found guilty and penalized 15 days in isolation during a disciplinary hearing held on June 23, 1999.

On September 10, 1999, plaintiff was charged with a major offense for indecent exposure, when he was observed standing on his bed masturbating in full view of the control booth officer. On September 17, 1999, at a pre-hearing detention review, plaintiff admitted the event occurred, but stated he was not

---

[4]Plaintiff's claims regarding use of the Ultron II devise were dismissed by Opinion and Order entered September 30, 2003.

aware that he could be seen.  Plaintiff was continued on pre-hearing detention.

On November 10, 1999, at approximately 8:30 a.m., Officer Davis was making security checks in Housing Unit 3, B Pod, when Card began kicking on his cell door.  Pearson was notified of the incident at 9:00 a.m.  Plaintiff was escorted to segregation by Officers Coleman and Cain and he was placed in five-point restraints at 10:30 a.m. Plaintiff was restrained for forty-six hours, with six breaks for meals and use of the restroom.  A nurse checked plaintiff's restraints each time they were reapplied.

On February 1, 2000, at 9:00 a.m., plaintiff submitted an informal complaint asking to see a doctor for severe back pain. Plaintiff received no response to his informal complaint.  At approximately 1:00 p.m., plaintiff kicked his door in an attempt to get an officer's attention.  Officer Carlton observed plaintiff kicking and banging his cell door.  Plaintiff was placed in five-point restraints at 1:00 p.m.[5]  At 1:30, a nurse checked plaintiff.  He complained that the pain was so severe that he had vomited.  The nurse observed regurgitated food and urine on the floor.  The nurse instructed plaintiff to exercise to relieve his back pain.  Plaintiff was restrained for forty-eight hours, with seven breaks for meals and to use the restroom.  The restraints were checked by a nurse each time they were reapplied. Plaintiff was charged with wilful destruction of state property for kicking his door;

---

[5]There appears to be some confusion regarding the timing of events. Apparently Burney was notified of the incident at 11:45 a.m. and authorized the placement of plaintiff in five-point restraints prior to the incident which records indicate occurred at 1:00 p.m.  See Defs.' Enclosure E.

however, that charge was dismissed.

At the March 3, 2005, hearing on the motions for partial summary judgment, counsel for both parties advised the court that there were no additional facts beyond those already in the record that would be presented at trial.

### III. Analysis

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986); Terry's Floor Fashions v. Burlington Indus., 763 F.2d 604, 610 (4th Cir. 1985). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. Celotex Corp., 477 U.S. at 322-24. Such facts must be presented in the form of exhibits and sworn affidavits. Failure by the nonmoving party to rebut the moving party's motion with such evidence will result in summary judgment when appropriate.

A mere scintilla of evidence is not sufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Although the court must draw all justifiable

inferences in favor of the nonmoving party, in order to successfully defeat a motion

for summary judgment, a nonmoving party cannot rely on " mere belief or

conjecture, or the allegations and denials contained in his pleadings." Doyle v.

Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995)(citing Celotex, 477 U.S. at

324).

## A.  Plaintiff's Claims

Plaintiff complains that he was subjected to cruel and unusual punishment in

violation of the Eighth Amendment and denial of due process, when he was placed

in five-point restraints on May 17-19, 1999, May 27-29, 1999, June 17-19, 1999,

November 10-12, 1999, and February 1-3, 2000.

## 1. Eighth Amendment

The Eighth Amendment, enforced against the states through the Fourteenth

Amendment, prohibits the infliction of "cruel and unusual punishments." U.S.

Const. amends. VIII, XIV.  The Eighth Amendment protects prisoners from the

"unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319

(1986) (citations omitted).  To establish an Eighth Amendment excessive force

claim, an inmate must satisfy a subjective component--that the prison official acted

with a sufficiently culpable state of mind--and an objective component--that the

harm inflicted on the inmate was sufficiently serious. Williams v. Benjamin, 77 F.3d

756, 761 (4th Cir. 1996).[6]

---

[6]The court will consider plaintiff's Eighth Amendment claim under the
excessive force standard rather than the deliberate indifference standard because

Plaintiff's Eighth Amendment excessive force claim must be measured according to the standards set forth in Whitley.  In order to establish an Eighth Amendment claim, plaintiff must allege and prove "obduracy and wantonness, not inadvertence or error in good faith. . . ." Whitley, 475 U.S. at 319.  The issue is whether the defendants inflicted unnecessary and wanton pain and suffering.  With respect to the subjective element, the court must inquire "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Id. at 320-21 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  The Supreme Court and the Fourth Circuit have set out the following factors to evaluate whether a prison official acted maliciously and sadistically: (1) the need for the use of force, (2) "the relationship between that need and the amount of force used," (3) the threat "reasonably perceived by the responsible officials," and (4) "any efforts made to temper the severity of a forceful response." Hudson, 503 U.S. at 7. The absence of serious injury is also relevant, though not dispositive of the subjective analysis. Id.

With respect to the objective element, a prisoner "asserting malicious and sadistic use of force need not show that such force caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action." Williams, 77 F.3d at 761 (quoting Hudson, 503 U.S. at 9). "All that is necessary is proof of more than *de minimus* pain or injury." Id. "Absent the most extraordinary

---

"the deliberate indifference standard is inappropriate when authorities use force to put down a prison disturbance." Hudson v. McMillian, 503 U.S. 1, 6, (1992).

12

circumstances, a plaintiff cannot prevail on an Eighth Amendment excessive force claim if his injury is *de minimis*." Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir. 1998). The Fourth Circuit has defined two types of extraordinary circumstances where *de minimus* injury may not necessarily defeat a claim of excessive force: when the " force is of a sort repugnant to the conscience of mankind . . . . or the pain itself [is] such that it can properly be said to constitute more than de minimus injury. " Taylor v. Norman, 25 F.3d 1259, 1264 n. 4 (4th Cir. 1994).   Moreover, the Fourth Circuit "specifically recognized that the objective component can be met by 'the pain itself,' even if an inmate has no enduring injury." Williams, 77 F.3d at 762 (quoting Norman v. Taylor, 25 F.3d 1259, 1263 n.4 (4th Cir. 1994)).

Construing the evidence in the light most favorable to defendants, on five occasions, plaintiff endured forty-six to forty-eight hours with his arms, legs and chest immobilized, with breaks from restraint every six hours on average.  Plaintiff claims he was restrained with his arm and leg joints at abnormal angles and that he suffered excruciating pain and even slight sprains.  Moreover, plaintiff claims the straps scraped and cut his skin.  Defendants assert that plaintiff suffered no serious injury.  However, the Fourth Circuit is  "wary of finding uses of force that inflict 'merely' pain but not injury to be *de minimus*, and therefore beyond requiring justification under the Eighth Amendment." Williams, 77 F.3d at 762 n. 2.   With respect to the use of restraints, the  Supreme Court has recognized that "[p]hysical restraints are effective only in the short term, and can have serious physical side effects when used on a resisting inmate . . . ." Washington v. Harper, 494 U.S.

210, 226-27 (1989).  In Williams, the court noted that:

> in our civilized society, we would like to believe that chaining a human
> being to a metal bed frame in a spread eagle position would never be
> necessary. Unfortunately it sometimes is. Courts have thus approved
> the limited use of four-point restraints, as a last resort, when other
> forms of prison discipline have failed.

77 F.3d at 763.  In Sadler v. Young, 325 F. Supp. 2d 689 (E.D.Va. 2004) rev'd.

on other grounds, 118 Fed. Appx. 762 (4th Cir. 2005), the court found that "any

reasonable jury would find that completely immobilizing an inmate in five-point

restraints for nearly forty-eight hours constitutes more than *de minimus* pain, even

when the inmate is temporarily released . . . and regardless of whether there is

proof that the inmate suffered any lasting injury."  Id. at 704.  Therefore,

defendants have failed to rebut plaintiff's showing as to the objective component of

his excessive force claim.

The court also finds that defendants have failed to rebut plaintiff's showing

on the subjective component of the excessive force claim.  Defendants assert that

they restrained plaintiff to control him and thus maintain the orderly operation of

the prison.  Accepting defendants' assertion that kicking the cell door could cause

the door to slide off its tracks, allowing it to open, and assuming arguendo that

plaintiff continued to kick his door in the hours between the reported incidents and

the time he was placed in five-point restraints, defendants may have been justified

in the initial placement of restraints under the Whitley test.  However, there is no

evidence that defendants made any effort to "temper the severity of the forceful

response."  Whitley, 503 U.S. at 7.  Moreover, the record does not support an

assertion that there was a need to control plaintiff.  Defendants do not assert that plaintiff continued to kick his cell door.  With the possible exception of February 1, 2000, there were significant lapses of time between plaintiff's disruptive behavior and the application of restraints.  On May 17, 1999, plaintiff was kicking his door at 8:49 a.m. and not placed into restraints until 10:05 a.m.  On May 27, 1999, plaintiff was banging on his door at 12:30 p.m. and placed in restraints at 1:45 p.m.  On June 17, 2005, plaintiff had an altercation with Hawes and Scott at 2:50 p.m.  The nurse observed plaintiff sitting on his bed at 4:20.  Plaintiff was placed in restraints at 5:09 p.m.  On November 10, 1999, plaintiff was kicking his cell door at 8:30 a.m.  Plaintiff was not placed in restraints until 10:30.  In each of these cases the threat posed by plaintiff's behavior had subsided for more than an hour before restraints were applied to "control" plaintiff.

Further, the record discloses nothing to justify plaintiff's continued restraint for periods of forty-six and forty-eight hours.  Defendants have neither presented evidence, nor asserted, that plaintiff exhibited any disruptive behavior during his time in restraints.  The court notes that each time restraints were applied it took forty-six to forty-eight hours to "control" plaintiff.  It is inconceivable that when an inmate kicks his cell door, then ceases for more than an hour, that five-point restraints for forty-eight hours are required to get the inmate under control. This pattern, where "control" comes only at the point where authorization from the Deputy Director of the Virginia Department of Corrections would be necessary, indicates that five-point restraints were not used for control.

There can be no doubt that defendants were aware of the nature of their action.  The extreme nature of five-point restraints for forty-eight hours is evidenced by the fact that to hold plaintiff even an hour  longer would have required the approval of the second-highest ranking official within the Virginia Department of Corrections.  Accordingly, construing the facts in the light most favorable to defendants, defendants subjected plaintiff to five-point restraints for between forty-six and forty-eight hours on five occasions for the purpose of punishment.  Accordingly, defendants have failed to rebut plaintiff's showing on the subjective component of the Eighth Amendment claim.

Defendants have failed to set forth facts sufficient to rebut plaintiff's showing of excessive force.  Accordingly, plaintiff's partial motion for summary judgment on the issue of liability on the excessive force claim is **GRANTED**.

2. Procedural Due Process

Plaintiff claims he was denied due process by being placed in five-point restraints and restrained for forty-six to forty-eight hours without procedural protections.  The United States Supreme Court has articulated a standard for determining when a particular punishment deprives an inmate of "liberty" within the terms of the Fourteenth Amendment's Due Process Clause, and thus, triggering the need for procedural protections.  Sandin v. Conner, 515 U.S. 472 (1995).   The proper inquiry is whether the punishment "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id. at 484.  For example, an inmate who is incarcerated subject to a lawful conviction has no liberty

interest in being free from placement in segregation, because segregation is "within the range of confinement" an inmate should expect to result from conviction. Id. at 487.  Clearly, inmates are not stripped of all their constitutional rights, but lawful incarceration requires withdrawing or limiting many privileges and rights, a retraction justified by the considerations underlying our penal system. Id. at 485.

Plaintiff claims that defendants deprived him of the protection of the Due Process Clause of the Fourteenth Amendment by placing him in five-point restraints for forty-eight hours without procedural protections. Defendants respond that they placed plaintiff in restraints to control him, not to punish him. They also argue that enduring forty-eight hours in five-point restraints is not an atypical and significant hardship on a prisoner.  In the state prison context, "[s]tates may under certain circumstances create liberty interests which are protected by the Due Process Clause." Sandin, 515 U.S. at 483-84. To determine whether state prison officials have deprived a prisoner of a protected liberty interest, courts should consider the nature of the deprivation that the prisoner suffered. See generally id. at 481-484. The liberty interests that a state creates "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (internal citations omitted).  A change in conditions of confinement deprives a prisoner of a state created liberty interest if the change imposes atypical and significant hardship on the inmate in

17

relation to ordinary prison life. See Beverati v. Smith 120 F.3d 500, 503 (4th Cir. 1997).

The court finds that defendants' application of five-point restraints for forty-eight hours under the circumstances imposed atypical and significant hardship on plaintiff in relation to the ordinary incidents of prison life. See Williams, 77 F.3d at 768-70 (finding " forceful" the argument that eight-hour confinement in four-point restraints imposes atypical and significant hardship); Davis, 156 F. Supp. 2d at 596 (finding that the application of five-point restraints for forty-eight hours imposes atypical and significant hardship).  The fact that officials initially place a prisoner in four-point restraints to gain control over him "does not mean that four-point restraints may be imposed indefinitely. At some point in time, an inmate so restrained would be entitled to some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied." Williams, 77 F.3d at 770.  Plaintiff' s "total immobilization in the restraints surely 'worked a major disruption in his environment,'" Williams, 77 F.3d at 769 (quoting Sandin 515 U.S. at 486), and this court finds that being totally restrained on a bed for almost forty-eight hours is substantially more restrictive than the conditions of confinement of the general prison population.

In Williams, the Fourth Circuit made it clear that procedural protections could not be required where an inmate was placed in restraints in response to a disturbance; however in so holding, the court noted that:

> This point gives us some pause as it relates to this case.  Simply because the initial application of the restraints occurred soon after a disturbance does not mean that four-point restraints may be imposed indefinitely.  At some point in time, an inmate so restrained would be entitled to some procedural protection to ensure that his liberty interest was not being arbitrarily and capriciously denied.  In this appeal, we decline to resolve where that point is.

Williams, 77 F.3d at 770 n.10.

Although Sandin and Williams do not address the precise factual scenario present in this action, Williams makes it clear that placing an inmate in four-point restraints for extended periods of time is an atypical and significant hardship, and Sandin establishes that prison officials may not impose these conditions without affording the inmate due process. The court finds that, together, they clearly establish plaintiff's right to be free from punishment in five-point restraints for forty-eight hours without due process protection.

Plaintiff asserts that due process could have been satisfied by a measure as simple as periodic reevaluation of the need for restraints by one of the few people who were authorized to initially have plaintiff placed in five-point restraints, rather than a blanket authorization of forty-eight hours of confinement in five-point restraints. There is no post-deprivation process that could remedy the denial of due process in a case such as this.

Another district court in this state has had the opportunity to address issues identical to those in this case.  Sadler, 325 F. Supp. 2d  689.  The plaintiff in Sadler had been placed in five-point restraints and left in restraints for forty-eight hours with breaks similar to those plaintiff received.  The court in Sadler found that

19

this violated due process, but did not determine at what point process would be due. In Sadler, the court "merely [held] that Sadler was entitled to process at some point during his nearly two days of confinement in five-point restraints" and that "the point had passed by the time the restraint had ended." Sadler 325 F. Supp. 2d at 706. Likewise, this court makes no finding of either the precise contours of the process that was due plaintiff or the exact point in time that plaintiff became entitled to due process. This court only finds that plaintiff was entitled to some procedural protection at some point well before the expiration of forty-six and forty-eight hours. Accordingly, plaintiff's motion for partial summary judgment on the issue of liability is **GRANTED**.

## B. Punitive Damages

Plaintiff seeks summary judgment on his claim to punitive damages. Punitive damages are available in § 1983 actions for conduct that involves "reckless or callous indifference to the federally protected rights of others," as well as for conduct motivated by evil intent. Smith v. Wade, 461 U.S. 30, 56 (1983). The Court of Appeals has stated that "there is no requirement that the standard for punitive damages be higher than the standard for determining liability." Cooper v. Dyke, 814 941, 948 n.5 (4th Cir. 1987)(citing Smith, 461 U.S. at 51-55). However, the issue of punitive damages is in the discretion of the jury. When the appropriate standard is met, the jury may, but is not required to, assess punitive damages. Id. at 948. Thus, a finding that defendants are liable for violating plaintiff's constitutional rights would make punitive damages possible but not

necessary.  To the extent that plaintiff asks this court either to award punitive damages or to declare entitlement to punitive damages, plaintiff's motion is **DENIED**.  The court will instruct the jury on punitive damages at the trial on the issue of damages.

## C. Attorney's Fees

Plaintiff has moved for an award of attorney's fees.  Reasonable attorney's fees are authorized pursuant to 42 U.S.C. § 1988 to prevailing parties.  The statute provides in relevant part:

> In any action or proceeding to enforce a provision of section[] . . . 1983 . . . of this title, the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the cost . . . .

42 U.S.C. § 1988(b)(2000).  To acquire prevailing party status, a plaintiff must achieve

> . . . at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought . . . . In short, a plaintiff " prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

Farrar v. Hobby, 506 U.S. 103, 111-12 (1992).

In prisoner lawsuits, 42 U.S.C. § 1997e(d) limits awards of attorney's fees:

> (1) In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that—
>> (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

> (B)  (i) the amount of the fee is proportionately related to the
> court ordered relief for the violation; or
> (ii) the fee was directly and reasonably incurred in enforcing
> the relief ordered for the violation.
> * * *
> (3)   No award of attorney's fees in an action described in
> paragraph (1) shall be based on an hourly rate greater than 150
> percent of the hourly rate established under section 3006A of Title 18,
> for payment of court-appointed counsel.

42 U.S.C. § 1997e(d)(2000).

Plaintiff has enjoyed significant success in this action and  has clearly

prevailed on the issues.  Once the court has determined that a party is the

prevailing party, the court must determine whether attorney's fees are appropriate.

The amount and propriety of attorney's fees are governed by the degree of

success achieved by the prevailing party.  In Hensley, the Supreme Court observed:

> If on the other hand, a plaintiff has achieved only partial or limited
> success, the product of hours reasonably expended on the litigation as
> a whole times a reasonable hourly rate may be an excessive amount.
> This will be true even where the plaintiff's claims were interrelated,
> nonfrivolous, and raised in good faith . . . . Again, the most critical
> factor is the degree of success obtained.

461 U.S. at 436.   In Farrar, plaintiffs were denied attorney's fees because their

success was insignificant.  506 U.S. at 114-16. There, after ten years of litigation,

plaintiffs received no relief except for one dollar in nominal damages, whereas the

plaintiffs in Farrar had sought $17 million.  Id. at 108.  While the jury had found a

non-specific due process violation, they determined that no harm had resulted from

the violation.  Id.  A technical victory such as that secured in  Farrar does not

entitle the prevailing party to an award of attorney's fees. Id. at 114-16.

22

Therefore, the issue of attorney's fees must be held until after trial.  Plaintiff must receive some relief in order to apply for attorney's fees.

## D. Defendant Scott

There is a suggestion of death upon the record with respect to Clayton Scott.  Counsel for defendants is attempting to ascertain whether there is a representative that can be substituted in place of the deceased.  Accordingly, this action is **STAYED** with respect to defendant Scott until a representative can be notified of this action or for a period of thirty (30) days.  If no representative can be found within thirty (30) days from the date of this order, defendant Scott will be dismissed.

## E. Defendants Hawes and Shifflett

At the oral argument on the motions for partial summary judgment, it was determined that defendants Hawes and Shifflett had no involvement in the decision to place plaintiff in five-point restraints or the actual restraint of plaintiff.  As there was no personal involvement on the part of these defendants, defendants Hawes and Shifflett are **DISMISSED** as defendants to this action.

## F.  Production of Plaintiff at Trial

By order entered October 20, 2004, the court deferred deciding which party would bear the cost of transportation, food, shelter, and security for plaintiff to attend trial.  In light of this court's decision that defendants are liable to plaintiff, the court **ORDERS** defendants to bear the costs associated with producing plaintiff at trial.

## IV. Conclusion

For the aforementioned reasons, the court **GRANTS** plaintiff's motion for summary judgment on the issue of liability.  Plaintiff's motion for summary judgment as to punitive damages is **DENIED**.  This action is **STAYED** with respect to defendant Scott.  Defendants Hawes and Schifflett are **DISMISSED** as defendants in this action.  The issue of attorney's fees will be addressed following the trial on damages.  Defendants are **ORDERED** to pay the cost of producing plaintiff for trial.

The Clerk is **DIRECTED** to send a copy of this Opinion and Order to counsel for plaintiff and counsel for defendants.

IT IS SO **ORDERED**.

_____/s/_____
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

September 13, 2005